UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

------------------------------------------------------x
AUTONOMOUS MUNICIPALITY OF SAN
JUAN,

        Plaintiff,

  -v-                                      No. 17 CV 2009-LTS

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO, et al.,

        Defendants.
------------------------------------------------------x

OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

APPEARANCES:

CHARLIE HERNÁNDEZ LAW OFFICES

By: Charlie M. Hernández
206 Tetuán St., Suite 701
Old San Juan, Puerto Rico 00901

*Attorneys for Plaintiff Autonomous Municipality of San Juan*

NORTON ROSE FULBRIGHT US LLP

By: Lawrence A. Larose
    Eric Daucher
1301 Avenue of the Americas
New York, New York 10019

*Attorneys for Plaintiff Autonomous Municipality of San Juan*

MARIANI FRANCO LAW, P.S.C.

By: Raúl S. Mariani Franco
P.O. Box 9022864
San Juan, Puerto Rico 00902

*Attorneys for Plaintiff Autonomous Municipality of San Juan*

WINSTON & STRAWN LLP

By: Julissa Reynoso
    Aldo A. Badini
    Marcelo M. Blackburn
    Michael A. Fernández
200 Park Avenue
New York, New York 10166

*Attorneys for Plaintiff Autonomous Municipality of San Juan*

PIETRANTONI MENDEZ & ALVAREZ LLC

By: Oreste R. Ramos
    María Dolores Trelles Hernández
Popular Center, 19th Floor
208 Ponce de León Ave.
San Juan, Puerto Rico 00918

*Attorneys for Defendants Government Development Bank for Puerto Rico and Puerto Rico Fiscal Agency and Financial Advisory Authority*

O'MELVENY & MYERS LLP

By: John J. Rapisardi
    Suzzanne Uhland
    Peter Friedman
    Daniel L. Cantor
    Andrew Parlen
    Brad M. Elias
Times Square Tower
7 Times Square
New York, New York 10036

*Attorneys for Defendants Government Development Bank for Puerto Rico and Puerto Fiscal Agency and Financial Advisory Authority*

LAURA TAYLOR SWAIN, United States District Judge

The autonomous municipality of San Juan ("San Juan," "Plaintiff," or the "Movant"), which is the largest municipality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and the Commonwealth's capital, moves pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction enjoining, pending certain structural changes and disclosures, the solicitation, disclosure and collection of votes in favor of a proposed restructuring support agreement for the Government Development Bank for the Commonwealth ("GDB"), dated May 15, 2017 (the "RSA"), under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2231 (the "Motion"). The Court heard oral argument on the Motion on September 11, 2017, and has considered thoroughly the parties' oral arguments and written submissions. For the following reasons, the Motion is denied. This Opinion constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rules of Civil Procedure 52(a)(2) and 65.

I.

FINDINGS OF FACT

San Juan has proffered very little in the way of evidentiary support for its contentions, confining its submissions in support of the Motion to its Memoranda of Law, the Declaration of its attorney Julissa Reynoso ("Reynoso Decl.") proffering newspaper articles, and the Declaration of Esperanza Ruiz ("Ruiz Decl."), the City Administrator of San Juan (the "City Administrator"), which proffers facts regarding San Juan's municipal services and interactions with GDB, the City Administrator's opinions regarding the terms of the RSA, and authentication

of certain correspondence and additional documents.[1] Defendants GDB and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") also proffered limited factual information in connection with their opposition to the motion, submitting the *Declaration of Christian Sobrino Vega in Support of GDB and AAFAF's Opposition to Plaintiff's Motion for a Preliminary Injunction* ("Vega Decl.").[2]  There seems, however, to be little dispute regarding the factual issues material to this motion practice.  Accordingly, the Court makes the following findings of fact based on uncontroverted non-hearsay evidentiary proffers, the content of documents whose authenticity appears to be undisputed, and apparent concessions during oral argument.

The Commonwealth is a territory of the United States that is currently suffering a fiscal crisis that was decades in the making.[3]  GDB is a public corporation and instrumentality of the Commonwealth, organized under Act No. 17-1948 (the "GDB Enabling Act") that, until recently, served as fiscal agent, depository bank, financial advisor, and lender to the Commonwealth and its municipalities, and which issued bonds, backed by revenue streams

---

[1]  The following documents are attached to San Juan's unverified complaint for declaratory judgment and injunctive relief (Docket entry no. 1, ("Compl.")): the investment policy of the Municipal Public Debt Redemption Collection Center ("CRIM") general trust agreement, the RSA, various letters to and from San Juan's counsel to counsel for the Financial Oversight and Management Board (the "Oversight Board") and AAFAF, the Oversight Board's unanimous written consent approving the RSA, and the bylaws of the Oversight Board.

[2]  Although the Oversight Board is named as co-defendant with GDB and AAFAF in the Complaint, San Juan is not seeking injunctive relief against the Oversight Board.

[3]  The Commonwealth suffered severe and widespread physical damage during the week of September 18, 2017, due to the passage of Hurricane María.  The effects of the storm will not be discussed further in this Opinion, as they are not material to the legal issues raised by the Motion.

including repayment of municipal loans, to outside investors. GDB holds general deposits belonging to, among other municipalities, San Juan.

On April 6, 2016, GDB's fiscal agent responsibilities and obligations were transferred to AAFAF, which had recently been created, pursuant to the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016 (the "Moratorium Act"). The Moratorium Act granted AAFAF authority to oversee all matters in connection with the restructuring of certain covered obligations designated by then Governor García-Padilla. AAFAF supplanted GDB's fiscal agent responsibilities, and the government of Puerto Rico decided to wind down GDB's operations and restructure its debts. Pursuant to the Moratorium Act, executive orders were issued that stopped virtually all municipal transfers and withdrawals out of the GDB. Actions taken pursuant to the Moratorium Act and subsequent forbearance agreements in connection with the negotiation of the RSA have frozen payments to GDB bondholders as well and stayed pending litigation.

On June 30, 2016, Congress enacted PROMESA, Title VI of which permits the restructuring of bond debt through "Creditor Collective Action" under voluntary restructuring support agreements certified by the Oversight Board[4] as "Qualifying Modifications," that are then voted upon by pools of similarly-situated bondholders after mandated disclosures concerning the terms of the proposed modifications. See generally, PROMESA § 601. Upon approval of the proposed modifications by the holders of at least two-thirds of the outstanding principal amount of each relevant pool, certification of the vote by the Oversight Board, and submission of the Qualifying Modification and vote to the United States District Court for the

---

[4] See supra note 1.

District of Puerto Rico for approval, the Qualifying Modification may be implemented. See PROMESA §§ 601(j); 601(m).

On January 18, 2017, the Commonwealth's legislature approved the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, Act 2-2017 (the "AAFAF Enabling Act"), which was signed into law by the Governor on the same day. The AAFAF Enabling Act expanded the powers of AAFAF, designating it as the only government entity authorized to restructure, and negotiate with holders of, debt issued by the government or its instrumentalities, and authorized AAFAF to compel any governmental entity to take action to comply with a fiscal plan certified by the Oversight Board. AAFAF negotiated the RSA for GDB, which has since been approved by numerous investor-bondholders and certain municipalities who have signed the RSA. (See Vega Decl. ¶ 8.) San Juan alleges that it was not part of the discussions leading to the proposed RSA and San Juan opposes the RSA. (See Compl. ¶ 5; Motion at 2.)

The Oversight Board has certified the RSA as a Qualifying Modification under Title VI of PROMESA. See PROMESA § 601(g)(2). (Vega Decl. ¶ 14.) As relevant here, the RSA treats the municipalities' deposits currently held by GDB as unsecured claims and accordingly classifies the municipalities into the same voting pool as holders of unsecured GDB bonds. (Vega Decl. ¶¶ 9-10.)[5] If the Court ultimately approves the Qualifying Modification and makes it binding on all creditors, see PROMESA § 601(g); 601(m), the unsecured claims will be mandatorily exchanged for securities issued by a new entity, with a face value substantially smaller than that of the deposits and currently-outstanding bonds, and payment terms supported by cash flow from the repayment of currently-outstanding loans to the municipalities, which will

---

[5] GDB anticipates two unsecured voting pools — one for unsecured claims not guaranteed by the Commonwealth and one for unsecured claims guaranteed by the Commonwealth. (Vega Decl. ¶ 15.)

remain payable in full.  (Compl. Exhibit B, Docket Entry No. 1-7, ECF pp. 27-28; Vega Decl. ¶ 9.)  With a limited exception not relevant here, the RSA does not permit the setoff of the value of any municipal assets held by GDB against the municipalities' outstanding loan repayment obligations.  (Id.)  By contrast, it appears that, in practice, GDB has historically debited the municipalities' deposits to cover biennial payments on the municipal loans as payments come due.  (Vega Decl. ¶ 12.)

GDB recognizes San Juan as the holder of $62,614,321.19 in deposits, of which $39,864,542.54 are funds denominated as "trust funds," the precise nature of which was not briefed by the parties, and $6,415,724.47 in "Excess CAE" funds as to which the RSA proposes a bilateral compromise agreement with San Juan.  (Ruiz Decl. ¶¶ 8-10.)  San Juan disputes the computations of these amounts (see Motion at 6; Ruiz Decl. ¶¶ 8-10), but those disputes are not material to the legal issues addressed in this Opinion.  As explained below San Juan contends, and GDB disputes, that San Juan and its fellow Puerto Rican municipalities have a right to setoff the full amount of their respective deposits against their respective outstanding loan obligations, that such setoff right constitutes security, and that the municipalities therefore should not be pooled with the unsecured creditors for voting purposes.  Instead, San Juan contends that the municipalities should vote in their own pool, an arrangement that could give them the power to defeat the Title VI restructuring proposal.

On August 24, 2017, the Puerto Rico legislature passed the GDB Debt Restructuring Act, Act No. 109-2017 (the "GDB Debt Act") for the purpose of enabling implementation of the Qualifying Modification under Title VI of PROMESA.  (Vega Decl. ¶ 10.)  Article 703 of the GDB Debt Act expressly provides that, "[n]otwithstanding any other law of the Government of Puerto Rico, no Government Entity shall have the authority or standing to

challenge [the] Act, the Restructuring Transaction, or the other transactions contemplated by [the] Act in any local or federal court." (See GDB Debt Act, "Article 703," Exhibit B to *Declaration of Brad M. Elias, Esq. in Support of GDB and AAFAF's Opposition to Plaintiff's Motion for a Preliminary Injunction* ("Elias Decl.").)

Citing newspaper reports, San Juan claims that it and other municipalities are being pressured by unspecified persons to commit to supporting the RSA prior to voting-related disclosures, and asserts that such early solicitation for a single voting pool, combined with public disclosure of the positions of the solicited municipalities, could taint the results of a re-vote were San Juan to prevail at a later date on a challenge to the voting structure. (Motion at 8; Exhibit 2 to Reynoso Decl.) San Juan has not proffered any affidavits or other admissible evidence concerning the voting intentions of any municipality or the likely voting patterns in the current pool scenario, a multiple-pool scenario, or a re-vote.

The RSA is not self-executing and cannot be put into effect until it has been approved by this Court after a favorable vote of the bondholders. See PROMESA § 601(m)(1)(D). The RSA includes an agreed timetable, which requires disclosures and commencement of voting solicitation by mid-September 2017, completion of voting by October 20, 2017, and submission to the Court for approval by November 9, 2017. (Opp. at 7; Vega Decl. ¶ 13, 15.) Failure to meet these deadlines would relieve the creditor parties of their obligation to support the proposed restructuring, and, if a sufficient number of creditors retract their support, lead to termination of the RSA. (Vega Decl. ¶ 17.) If the RSA were terminated, debt collection forbearance elements of the RSA would also terminate, currently stayed litigation by bondholders could recommence, and GDB might be forced to start the Title VI process anew or file a petition under Title III of PROMESA to effectuate a debt restructuring. (Vega Decl. ¶¶

18-19.) Title III proceedings are more complex and expensive than Title VI proceedings, and much time and public expense have already been invested in negotiating the current Title VI proposal. (Vega Decl. ¶¶ 7-8.)

II.

CONCLUSIONS OF LAW

San Juan's effort to halt the RSA solicitation, disclosure, and voting process focuses on contentions regarding its rights in connection with the deposits San Juan holds with GDB. San Juan argues that it has a right to set off the value of its deposits against its future payment obligations under loans it has outstanding from GDB. Pointing to PROMESA's requirement that "separate Pools shall be established corresponding to the relative priority or security arrangements of each holder of Bonds against each issuer . . . ,"[6] San Juan further argues that because, the purported setoff rights amount to security for its deposit claim, it should, with the other depositing municipalities, vote in its own pool of municipalities, separate from the unsecured creditors of GDB. San Juan further argues that the balance of harms tips in its favor and it would suffer irreparable harm if the unsecured pool-only voting process is not halted, because any re-vote would be "tainted."

Subject Matter Jurisdiction

GDB raises the issue of subject matter jurisdiction, arguing that Article 703 of the GDB Debt Act deprives San Juan and the other Puerto Rican municipalities of standing and

---

6   See PROMESA § 601(d)(3)(A).

authority to challenge the GDB restructuring, thus depriving this Court, for lack of a party with standing, of subject matter jurisdiction over San Juan's claims.  (See GDB Debt Act, Article 703.)  GDB also directs the Court's attention to a Ninth Circuit decision, Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1363-64 (9th Cir. 1998), which held that political subdivisions of states have no standing to challenge the constitutionality of their states' actions in federal court, since the existence and authority of the subdivisions are derived from the states themselves, although GDB acknowledges that other circuit courts have applied that principle more narrowly.

San Juan contends that Article 703 is preempted by federal law.  In aid of that counterargument, San Juan points to Section 601(n)(2) of PROMESA, which provides that "there shall be a cause of action to challenge unlawful application of this section," and Section 4 of PROMESA, which provides that PROMESA "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  San Juan also seeks to parse Article 703 more narrowly than does GDB, arguing that, while the GDB Debt Act purports to preclude challenges of the substantive aspects of the restructuring support agreements, it does not speak to preliminary procedural issues such as the voting pool structure San Juan raises here.

The Court must address the issue of subject matter jurisdiction prior to engaging with the merits of an action, as federal courts are ones of limited jurisdiction and, indeed, the Federal Rules of Civil Procedure instruct that if a federal "court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3); see Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Here, however, the parties have raised, but have not explored fully, the complex and nuanced issues of state and

federal law interpretation, supremacy, and preemption that will have to be analyzed thoroughly to determine the issue of subject matter jurisdiction. Those issues have been revisited, in greater depth, in a recently-filed motion to dismiss this case. Because resolution of San Juan's request for a provisional remedy does not require the Court to determine the merits of Plaintiff's claims, instead requiring only that the Court examine likelihood of success on the merits and related issues, and because a federal court in any event has "very broad discretion in determining the manner in which it will consider the issue of jurisdiction," the Court will defer the determination of the subject matter jurisdiction question to the dismissal motion practice and instead confine its analysis in this proceeding to the question of whether Plaintiff has demonstrated an entitlement to preliminary injunctive relief. See Valedon Martinez v. Hosp. Presbiteriano de la Cumunidad, Inc., 806 F.2d 1128, 1132 (1st Cir. 1986).

Preliminary Injunction Standard

In determining a motion for a preliminary injunction, the Court considers: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). In order to establish likelihood of success on the merits, "plaintiffs must show 'more than mere

possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueno, 699 F.3d at 10 (quoting Respect Main PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

Likelihood of Success on the Merits

Plaintiff's claim in this motion practice of entitlement to a separate voting pool for municipalities turns on its assertion that it has a legal right to set off its deposits at GDB against payment obligations on its loans from GDB as they come due. Such a right of setoff, San Juan contends, constitutes a difference in "the relative . . . security arrangements" of the municipalities' rights to GDB's repayment of their deposits[7] and the unsecured rights of general GDB bondholders to payments on their GDB bonds that requires different voting pools under Section 601(d)(3)(A) of PROMESA. In support of this proposition, San Juan cites two Commonwealth statutes and historical practice.

*The Statutes*

San Juan turns first to section 559a(c) of title 7 of the Laws of Puerto Rico, which is part of the GDB Enabling Act and provides that "a depositor or receiver may offset the amount of its deposit against any outstanding balance of a loan from the Bank as full and final payment up to the amount of the deposit." San Juan contends that the statute unambiguously provides

---

[7] Puerto Rico law treats bank deposits as loans by the borrower to the bank. Santos de Garcia v. Banco Popular, 172 D.P.R. 759, 774 (2007). Deposits thus fall into the broad category of "bonds" that can be restructured under Title VI of PROMESA. See PROMESA section 5(2) (defining "bond" to include, inter alia, loans "or other financial indebtedness for borrowed money . . . of which the issuer, obligor, or guarantor is the territorial government.")

municipal depositors/borrowers with an absolute right of setoff.  San Juan, in advancing this interpretation, dismisses as insignificant the fact that section 559a is titled "Priority of Expenses and Claims in a Receivership," arguing that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." (See Docket Entry No. 44 at 8 (quoting Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947))).  While San Juan's proposition is based on the well-recognized principle that a court may not rely on titles or headings to interpret an otherwise unambiguous statute, an examination of the other substantive provisions of the statute, in light of the context of its enactment and specific statements of the legislature, makes clear that the offset rights granted by section 559a(c) arise only in the context of a GDB receivership and are inoperative here, since GDB is not in receivership.  Cf. Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 212 (1998) (declining to rely on a statute's title where the text was not susceptible to multiple constructions).

Section 559a was enacted as part of Chapter 3 of the Moratorium Act, which was entitled "Amendments to GDB Organic Act Related to Receivers."  (Parte II – English Version of the Moratorium Act, Chapter 3, Docket Entry No. 41-3, at 26-31, attached as Exhibit A to Elias Decl.)  The legislature explained in a summary introduction to the uncodified version of the legislation that Chapter 3 was enacted to update GDB's outdated receivership provisions by "modifying the process for the appointment of a receiver, clarifying the receiver's powers, and establishing priorities of expenses and unsecured claims in a receivership."  (Id. at 10.)  Chapter 3 added provisions that were ultimately codified as sections 559, 559a, and 559b of Title 7 of the Laws of Puerto Rico.  Section 559 provides procedures for the appointment of a receiver and section 559b comprises provisions relating to the treatment of pre-receivership contracts.

Section 559a includes several subsections that, like subsection (c), include references to a receiver or to receivership.

In interpreting statutes, courts must examine the plain meaning of the statutory language in the context of the entire statutory scheme. GMC v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006) (quoting Darling's v. Ford Motor Co., 2003 ME 21, 825 A.2d 344, 346 (2003) (Courts "examine[] the plain meaning of the statutory language and consider[] the language the context of the whole statutory scheme.") (internal quotations marks and citations omitted)); see also Yates v. United States, 135 S. Ct. 1074, 1083-84 (2015) (interpreting the breadth of a ban on the destruction of tangible objects to obstruct a federal investigation based, in part, on the section's placement in the relevant statute and the United States Code). Here, such examination leads inescapably to the conclusion that Movant has failed to carry its burden of demonstrating that it is likely to succeed on the merits of its argument that the offset right granted by section 559a(c) applies outside the context of a receivership of GDB and thus requires a separate voting pool for municipalities.

San Juan also contends that it has a setoff right based on a general provision of the Puerto Rico Civil Code that permits setoff (characterized in the English version of the statute as "compensation") where several criteria are met. See 31 L.P.R.A. §§ 3221 ("When Compensation Takes Place") and 3222 ("Requisites"); see also Phico Ins. Co. v. Pavia Health, Inc., 413 F. Supp. 2d 76, 83 n.5 (D.P.R. 2006) (Compensation is "the Commonwealth equivalent of setoff."). Section 3222 of the Puerto Rico Civil Code requires, inter alia, that "both debts are due" at the time of the "Compensation" determination. According to San Juan, it meets this criterion notwithstanding the fact that its deposits at GDB are, presumably, payable on demand but no payment on its loans from GDB, which require biennial payments, is currently due,

because its loan payments will come due at regular future intervals and because San Juan has a right to accelerate its payments under the loan. The statutory language appears to speak, however, of a current mutual obligation, and must be applied in accordance with its terms. See United States v. Rivera, 131 F.3d 222, 224 (1st Cir. 1997) ("When the plain meaning is clear on its face, the sole function of the courts is to enforce [the statute] according to its terms.") (citations and internal quotation marks omitted). Metco Mining & Minerals v. PBS Coals (In re Metco Mining & Minerals), 171 B.R. 210, 218 (Bankr. W.D. Pa. 1994), relied upon by Plaintiff in support of its argument that a firm obligation with a future payment date is sufficient to support a setoff right, is not persuasive here, as it interpreted section 553 of the Bankruptcy Code (which is inapplicable in a PROMESA Title VI proceeding) rather than the Puerto Rico statute at issue here. On the current record, Movant has failed to demonstrate that it is likely to succeed on the merits of its claim that it is secured under Section 3222 of the Puerto Rico Civil Code because it has not established that its future loan payment obligations, although potentially dischargeable through accelerated payments, represent a current obligation that parallels GDB's current obligation to repay San Juan's deposit on demand.[8]

*Historical Practice*

Finally, San Juan proffers evidence, and GDB does not dispute, that GDB has until recently followed a practice of debiting municipality deposit holdings to cover loan repayment obligations as those obligations of the municipality have come due. (See Tr. of

---

[8] Finding that Plaintiff fails to demonstrate a likelihood that it will establish that "both debts are due," the Court declines to consider Defendants' argument that pending lawsuits by other GDB creditors preclude San Juan from meeting another of the statutory criteria – "[t]hat none [of the debts] is subject to any retention or suit instituted by a third person . . . ." 31 L.P.R.A. § 3222(5).

September 11, 2017 Hr'g at 13:25, 14:1-18 and Exhibit of Minutes of November 28, 2016 CRIM Board Meeting.)  In the absence of a legal basis for San Juan's claim of a setoff right, this practice, which is just as consistent with a convenient method of payment under circumstances in which each party is confident that the other is able to uphold its part of the bargain at the time as it is with a right to setoff of current mutual obligations, is insufficient to show that San Juan is likely to succeed on the merits of its claim that it has a legal right to setoff of its deposits against its loan repayment obligations.

San Juan has thus failed to carry its burden of demonstrating that it is likely to succeed on its claim that it is a secured creditor entitled to be classified separately from unsecured bondholders for purposes of voting on the proposed RSA.

Irreparable Harm

San Juan, while identifying the vital municipal services affecting a substantial portion of the population of Puerto Rico that San Juan uses its available funds to provide for, does not attack the ultimate goal of the restructuring proposed as a prospect of irreparable harm.  Rather, San Juan's focus here is more narrow, amounting to a claim that, if the municipalities' votes are solicited on the basis of a combined unsecured creditors' pool as currently proposed, the message that the municipalities can only vote in a class with the unsecured creditors, and political pressure to go along with the RSA, will constrain municipalities to take positions on the restructuring that they might not otherwise take if given the opportunity to vote in a separate pool.  San Juan does not specify the outcome that it thinks might be achieved by separate pool voting, and the record contains no evidence as to the voting intentions of any municipalities other

than the few that have already signed on as supporters of the RSA. San Juan nonetheless argues that the absence of an opportunity to vote in a separate pool in the first instance will inflict harm that cannot be remedied by a second opportunity to vote if the Court determines, at the time that the Qualifying Modification is put before it for final approval, that the voting procedures were improper. According to San Juan, there will be a "taint" from the initial vote that will irreparably distort the result of the second vote, so that the only effective relief is an injunction preventing any vote and even any further solicitation until the voting pool question is resolved.

Instead of offering evidence showing that there is a specific prospect of this sort of problem in Puerto Rico in connection with the transaction contemplated by the RSA, San Juan points to judicial decisions from other jurisdictions arising from different factual contexts. The Court finds those decisions unpersuasive as predictors of the likelihood of irreparable harm here. San Juan relies on Berkman v. Rust Craft Greeting Cards, Inc., 454 F. Supp. 787, 794 (S.D.N.Y. 1978), for the proposition that an injunction to prevent a tainted vote for corporate directors is preferable to ordering a new election. In Berkman, the court found that certain of the candidates had failed to disclose information that was material to their fitness for office, and that a corporate merger might have to be unwound were the vote to go forward in the absence of proper pre-vote disclosure. Id. at 794. Here, by contrast, San Juan has failed to make a showing of likelihood of success on its claim of an improper voting structure, and the record is devoid of evidence of harm that could taint a re-vote or that would persist if San Juan were to prevail upon a re-vote. Morris v. Int'l Bhd. of Locomotive Eng'rs, 165 F. Supp. 2d 662, 672 (N.D. Ohio 2001), relied upon by San Juan to establish that the early release of election results and the public knowledge of voters' positions gleaned from a judicially voided vote in the first instance could cause a different result upon a re-vote than if the initial vote were enjoined, is also inapposite. The

Morris court's decision to enjoin a vote on a labor union merger based on the prospect that a procedurally deficient vote could rationally "poison[] the electoral well," was supported by credible affidavit evidence. Here, Movant offers nothing more substantial than speculation, unsupported by any evidence, in aid of its assertion that irreparable harm will flow from failure to enjoin the voting process, and has not carried its burden of demonstrating that injunctive relief is necessary to prevent such harm. See Nw. Bypass Grp. v. United States Army Corps of Eng'rs, 453 F. Supp. 2d 333 (D.N.H. 2006) (Irreparable harm must be "immediate and serious rather than merely remote and speculative.").

Balance of Harms

For substantially the same reasons, Movant has failed to demonstrate that the balance of harms tilts in its favor. Movant only speculates as to voting outcomes. Defendants, on the other hand, have proffered clear evidence of concrete harm attendant to a delay in the process of voting on the RSA. Under the unambiguous terms of the negotiated and certified RSA, any delay in the delivery of solicitation material or voting would allow any signatory to that agreement to withdraw. In other words, if the process were delayed, GDB would lose the power to hold signatories to their contractual commitments to support the current restructuring, which was the product of substantial negotiations and investments of time and limited public assets. If sufficient signatories were to withdraw their commitments, the RSA would collapse, leaving open the potential for chaotic litigation, requiring a restart of negotiations for a Title VI restructuring, or leading GDB into the much more complicated and expensive process of restructuring under Title III of PROMESA. On this record, the balance of harms tips decidedly in favor of Defendants.

CONCLUSION

San Juan's motion for a preliminary injunction is, accordingly, denied in its entirety. This Opinion resolves docket entry no. 35 in case 17-CV-2009.

SO ORDERED.

Dated: September 27, 2017

      /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge